IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LARON M. JONES,<br><br>                    Petitioner,<br><br>     vs.<br><br>STATE OF NEBRASKA, SCOTT R. FRAKES, Director, Nebraska Correctional Services; and MICHELL CAPPS, Warden, Nebraska State Penitentiary;<br><br>                    Respondents. | **8:18CV411**<br><br><br>**MEMORANDUM AND ORDER** |

This matter is before the court on Petitioner Laron M. Jones' ("Petitioner" or "Jones") Amended Petition for Writ of Habeas Corpus.[1] (Filing No. 10.) For the reasons that follow, Petitioner's Amended Petition is denied and dismissed with prejudice.

## I. CLAIMS

Summarized and condensed, and as set forth in the court's initial review order (filing no. 11), Jones asserted the following claims that were potentially cognizable in this court:

---

[1] The court determined that Jones' original habeas petition (filing no. 1) was deficient because it was not signed under penalty of perjury. (*See* Filing No. 9.) The court found that Jones' amended petition incorporated all the same claims from his original petition and thus considered the amended petition as superseding the original petition. *See* NECivR 15.1(b). (Filing No. 11 at CM/ECF p. 1 n.1.)

Claim One:      Petitioner was denied effective assistance of counsel and a fair trial because *trial counsel* (1) failed to suppress, object to, and properly impeach the identification testimony of witnesses Alanna Delany, Saraha Richards, Dale Gaver, and Giovanni Barrios (filing no. 10 at CM/ECF pp. 21-34); (2) failed to file a motion to dismiss (*id.* at CM/ECF pp. 34-35); (3) failed to properly investigate and call numerous witnesses provided to counsel by Petitioner who were important to Petitioner's alibi defense (*id.* at CM/ECF pp. 36-41); and (4) generally failed to conduct an adequate pretrial investigation and to gather defense evidence (*id.* at CM/ECF pp. 41-45).

Claim Two:      Petitioner's right to due process was violated when the prosecution failed to disclose (1) the recording of Petitioner's police interview and (2) the photographic line up shown to Jenna McBride in violation of *Brady*. (*Id.* at CM/ECF pp. 63-67.)

Claim Three:      Petitioner was denied effective assistance of counsel because *appellate* counsel failed to raise on direct appeal that trial counsel was ineffective (1) for the reasons set forth in Claim One and (2) for failing to raise *Brady* violations. (*Id.* at CM/ECF pp. 69-70.)

Claim Four:      Petitioner was denied due process and the right to a fair trial because (1) Nebraska's second-degree murder statute is facially unconstitutional as it does not provide fair warning sufficient to prevent arbitrary enforcement (*id.* at CM/ECF pp. 73-89) and (2) the substantive change to the elements of second degree murder and sudden quarrel manslaughter is a new rule of constitutional law that should be applied retroactively to Petitioner (*id.* at CM/ECF pp. 93-95).

Claim Five:      Petitioner was denied due process and the right to a fair trial because the trial court committed plain error in giving Jury Instruction No. 8. (*Id.* at CM/ECF pp. 99-101.)

([Filing No. 11 at CM/ECF pp. 1-2](#).)[2]

## II. BACKGROUND

### A. Conviction and Sentence

The court states the facts as they were recited by the Nebraska Supreme Court in *State v. Jones*, 293 Neb. 452, 878 N.W.2d 379 (2016) ([filing no. 13-1](#)). *See Bucklew v. Luebbers*, 436 F.3d 1010, 1013 (8th Cir. 2006) (utilizing state court's recitation of facts on review of federal habeas petition).

### 1. Events Surrounding Shooting

In the early morning hours of March 7, 2014, a group of friends gathered at the home of Alanna Delaney for an "after-hours" party. Those in attendance included Delaney; Saraha Richards; Jamie Thiem; Dale Gaver; Josue Sanchez; Giovanni Barrios; D'Angelo Goods; and the decedent, Samuels, among others. Around 2:30 a.m., three black males and one black female arrived uninvited at the party. One of the black males was Milton Butler, who came to the party to confront Thiem, his ex-girlfriend and the mother of his child. One of the black males was identified as Jones. The other black male and black female were never identified.

Butler barged into the residence and began yelling at Thiem. Then he pulled her out of the house by her hair, banging her head against a doorframe on the way out. Others at the party were concerned and followed them outside. Sanchez came to Thiem's aid, and a fight ensued in the front yard with Butler, Jones, and the unidentified black male teaming up against Sanchez. Jones brandished a gun and stated that anyone who jumped in to help Sanchez would be shot. The fight dissipated after Sanchez was knocked unconscious and taken back into the house by his friends.

---

[2] The court dismissed Claim Six. ([Filing No. 11 at CM/ECF pp. 3](#), 4.)

Butler, Jones, and the unidentified black male and black female got into their vehicles and began leaving the scene. Most of the people from the party went back inside the house. As Butler was backing his vehicle out of the driveway, Goods came outside to retrieve something from the front yard. Butler then stopped his vehicle, got out, and began a second altercation with Goods. Just as the altercation was about to turn physical, several shots were fired into the air, followed by a pause, and then several more shots were fired toward the house. Samuels was standing on the porch and suffered gunshot wounds in his lower right leg and in the right side of his neck. He died from those injuries.

## 2. Witness Testimony

### (a) Alanna Delaney

Delaney testified that during the initial altercation with Sanchez, an individual she knew as "Clown" flashed a gun from his waistband and told her not to interfere with the fight or she would be shot. She was standing in the middle of the yard when shots rang out. Gaver pushed her to the ground and told her to stay down. While lying on the ground, she lifted her head and clearly observed "Clown" shooting the gun toward the porch.

Delaney testified that she was familiar with both "Clown" and Butler and that there was no doubt in her mind it was "Clown" shooting the gun, not Butler. Delaney knew Butler due to Butler's relationship with Thiem, and she had met him approximately 5 to 10 times. She was familiar with "Clown" from having met him at a location she described as a haunted house and a couple of times at her house or a bar when he was with Butler. Delaney described Butler as "skinnier" and having a "fade or a brush cut" hairstyle. By contrast, Delaney stated that "Clown" was "thicker," and she described his hairstyle as "French braided to the scalp." She stated that "Clown" was wearing a black T-shirt and blue jeans. Delaney identified Jones in court as "Clown."

### (b)  Saraha Richards

Richards knew Butler through Thiem and described him as being skinny and having short hair. She had also met "Clown" on a couple of prior occasions, including a New Year's Eve party approximately 3 months prior to this incident. She described "Clown" as similar in height to Butler, but "heavier." Richards stated that before the shooting occurred, "Clown" said that if anyone interfered with the fight that was going on, that person was going to get shot. She said that "Clown" fired the first few shots in the air, then lowered the gun and started shooting at the house. Richards identified Jones in court as "Clown."

### (c)  Dale Gaver

Gaver testified that he saw "Clown" display the gun prior to the shooting and then observed him fire the gun three times into the air. Gaver started running toward the side of the house and heard more shots fired. As he got to the corner of the house, he turned around and saw "Clown" aiming and shooting the gun at the house. He explained that although it was dark outside, he could see what was going on because a street light was on, and that he was only about 10 feet away when he observed "Clown" flash the gun. Gaver described "Clown" as wearing a hoodie and a darker shirt. Gaver stated that "Clown" was wearing a hat initially, but was no longer wearing the hat once he became involved in the altercation with Sanchez. Gaver identified Jones in court as "Clown."

### (d)  D'Angelo Goods

Goods described the shooter as shorter and stockier with "nappy" braided hair that looked as if it had not been freshly done. Goods testified that during his altercation with Butler, the shorter, stockier individual approached the yard and asked, "'What's up?'" Goods observed the man firing shots into the air, then aiming and shooting at the house. He did not see Butler or anyone else with a gun, other than the stockier black male with nappy hair.

### (e) Giovanni Barrios

Barrios testified that he attempted to stop the fight, but that one of the black men flashed a gun and told him to back up. Barrios described this man as having a "[b]igger build, stockier, facial hair" and wearing jeans and a hoodie. Barrios identified Jones in court as that man.

### 3. Investigation

The witnesses were separated at the scene and individually transported to police headquarters to be interviewed. Jones was developed as a suspect as a result of those interviews. Delaney, Richards, and Gaver each identified Jones in a photographic lineup as the shooter. Barrios identified Jones as the man that brandished a gun during the initial altercation.

The following day, officers executed a search warrant at a residence Jones shared with his girlfriend, Jenna McBride. She confirmed that Jones' nickname is "Clown." She described Jones as "a little bit shorter, stockier with longer hair" that is "braided back." McBride directed officers to the clothes Jones had been wearing the night before, which included a pair of dark jeans, a black T-shirt, and a light gray zip-up hoodie with a broken zipper.

McBride was taken in and interviewed by law enforcement. She testified that she received a text message from Jones at 3:04 a.m. on March 7, 2014, asking her to pick him up at his aunt's house as soon as possible. When she picked him up approximately 15 minutes later, he was with Butler and another older black male who went by the name of "Mario." McBride described Jones' demeanor as "mad and irritated." Jones told McBride about the fight and mentioned that someone had been shot.

Jones was arrested and charged with first degree murder, use of a deadly weapon (firearm) to commit a felony, and possession of a deadly weapon by a prohibited person.

## 4. Motion to Suppress

Prior to trial, Jones moved to suppress witness identification testimony, alleging that the identification procedure used by police was unnecessarily suggestive and tainted the identifications. The evidence adduced at the hearing showed that a lineup consisting of six photographs was used, which accidentally included two photographs of Jones: one in position No. 5, and one in position No. 6. The detective who created this lineup attributed the error to sloppiness on his part.

This lineup was shown to at least two witnesses, including Delaney, who identified Jones in position No. 5. The other witness did not identify anyone in the lineup and did not identify Jones at trial. It is unknown whether any other witnesses were shown this flawed lineup.

At the suppression hearing, the State offered the following testimony: The police separated the witnesses at the scene and transported them to the police station in separate cruisers, the witnesses were kept in separate areas at the station, and officers were standing by to make sure they did not converse with one another.

Delaney testified that the fact that "Clown" was depicted twice in the photographic lineup did not affect her identification of him. In fact, she did not even notice "Clown's" photograph in position No. 6 until she was reviewing the lineup later in the county attorney's office. The detective that administered the lineup was also unaware of the mistake until she returned to her desk after showing it to Delaney. At that point, a new photographic lineup was created in which the photograph in position No. 6 was replaced with a different photograph; however, the other photograph of Jones remained in position No. 5.

Richards, Gaver, and Barrios were shown the corrected lineup. Richards and Gaver identified the shooter in position No. 5. Richards wrote on the comments section that she was "110,000%" sure he was the shooter. Barrios identified the person who flashed the gun in position No. 5.

The witnesses' cell phones were confiscated, and they were told not to communicate with other witnesses until all of them had been interviewed. All of the witnesses were admonished not to speak to other witnesses about their identifications. Delaney, Richards, Gaver, and Barrios testified that they did not talk to any other witnesses prior to being interviewed and did not discuss their identifications with any other witnesses.

The district court issued a written order denying Jones' motion to suppress. The court found that Delaney was the only witness who saw the photographic lineup that had two pictures of Jones. The other witnesses were shown photographic lineups that contained only one photograph of Jones.

## 5. Trial

The evidence at trial was consistent with the facts stated above. In addition, there was evidence regarding DNA testing that was performed on a "Brooklyn Nets" ball cap found at the scene. Although it produced only a partial DNA profile, Jones could not be excluded as the major contributor. The probability of a random individual matching that DNA profile is 1 in 7 billion for Caucasians, 1 in 4.28 billion for African-Americans, and 1 in 16.6 billion for American Hispanics. The parties also stipulated that Jones had been convicted of a felony and was a person prohibited from possessing a deadly weapon.

After all the evidence had been presented, a jury instruction conference was held. Jones offered the following proposed instruction: "Research has shown that people may have greater difficulty in accurately identifying the members of a different race. You should consider whether the fact that the witness and the suspect

are not of the same race may have influenced the accuracy of the witnesses' identification." The State objected, and the district court refused to give the proposed instruction.

The jury found Jones guilty of first degree murder, use of a deadly weapon (firearm) to commit a felony, and possession of a deadly weapon by a prohibited person. He was sentenced to life imprisonment for murder, and consecutive terms of 10 to 20 years' imprisonment on each of the other two convictions. Jones appeals.

## B.  Direct Appeal

Jones appealed his convictions to the Nebraska Supreme Court on May 1, 2015. (Filing No. 13-3.) Jones was represented both at trial and on direct appeal by the Douglas County Public Defender's Office. Jones assigned that the state district court (1) committed plain error in denying his motion to suppress witness identification testimony, (2) erred in refusing his proposed jury instruction regarding cross-racial identification, (3) abused its discretion by accepting the jury's guilty verdicts when the evidence was insufficient to sustain his convictions, and (4) imposed excessive sentences on the weapon convictions. (Filing No. 13-1 at CM/ECF p. 7.)

In a published opinion, the Nebraska Supreme Court affirmed Jones' convictions and sentences. (Filing No. 13-1.) The Nebraska Supreme Court declined to reach Jones' assignment of error with respect to his motion to suppress because trial counsel did not object at trial to the various witnesses' identifications of Jones. (Id. at CM/ECF pp. 8-9.) The court rejected Jones' remaining assignments of error, concluding that the cross-racial identification instruction was not supported by the evidence, that there was sufficient evidence to support the convictions, and that the sentences imposed were not excessive. (Id. at CM/ECF pp. 9-11.) The mandate issued on January 4, 2017. (Filing No. 13-3 at CM/ECF p. 3.)

## C.  Postconviction Action

Jones filed a pro se verified motion for postconviction relief on April 26, 2017. (Filing No. 13-9 at CM/ECF pp. 2-57.) Jones alleged multiple instances of ineffective assistance of trial and appellate counsel, prosecutorial misconduct, and errors related to the second degree murder charge, including the jury instructions. (*Id.*) In a written order entered on September 27, 2017, the state district court denied postconviction relief without an evidentiary hearing. (*Id.* at CM/ECF pp. 65-72.) The state district court also denied Jones' motion for appointment of counsel. (*Id.* at CM/ECF p. 59.)

Jones appealed to the Nebraska Supreme Court, arguing that the state district court erred in (1) finding that certain allegations made in his postconviction motion could have been litigated on direct appeal, (2) failing to grant him an evidentiary hearing, (3) finding that he failed to allege prejudice by counsel's alleged ineffective assistance, and (4) failing to appoint counsel. (Filing No. 13-6 at CM/ECF p. 9.) The Nebraska Supreme Court categorized Jones' arguments as follows:

> (1) ineffective assistance of trial and appellate counsel in (a) not locating alibi witnesses and (b) not objecting to eyewitness identification; (2) failure of the trial court to appoint counsel; (3) error of the trial court in finding that certain allegations were procedurally barred; and (4) his contention that this court should find plain error in (a) the giving of jury instruction No. 8 on unintentional manslaughter, (b) the district court's finding that he was represented by the same counsel at trial and on direct appeal, and (c) the district court's finding that DNA placed him at the scene because he does not dispute that he was at the scene.

(Filing No. 13-2 at CM/ECF pp. 4-5.) The Nebraska Supreme Court rejected Jones' claims and affirmed the judgment of the district court in a memorandum opinion dated May 9, 2018. (Filing No. 13-2.) The mandate issued on August 6, 2018, after a motion for rehearing was overruled. (Filing No. 13-3 at CM/ECF p. 5.)

**D. Habeas Petition**

Jones timely filed his Amended Petition in this court on November 6, 2018. (Filing No. 10.) In response to the Amended Petition, Respondents filed an Answer (filing no. 16), a Brief (filing no. 17), and the relevant state court records (filing no. 13). Respondents argue that the claims are either unexhausted and/or procedurally defaulted or without merit. Jones did not file a brief in response to Respondents' Answer and Brief. This matter is fully submitted for disposition.

## III. OVERVIEW OF APPLICABLE LAW

Various strands of federal habeas law intertwine in this case. They are (1) exhaustion and procedural default; (2) the deference that is owed to the state courts when a federal court reviews the factual or legal conclusions set forth in an opinion of a state court; and (3) the standard for evaluating a claim of ineffective assistance of counsel. The court elaborates upon those concepts next so that it may apply them later in a summary fashion as it reviews Jones' claims.

**A. Exhaustion and Procedural Default**

As set forth in 28 U.S.C. § 2254:

(b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–

(A) the applicant has exhausted the remedies available in the courts of the State; or

(B)(i) there is an absence of available State corrective process; or

(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

The United States Supreme Court has explained the habeas exhaustion requirement as follows:

> Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

*O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

A state prisoner must therefore present the substance of each federal constitutional claim to the state courts before seeking federal habeas corpus relief. In Nebraska, "one complete round" ordinarily means that each § 2254 claim must have been presented to the trial court, and then in an appeal to either the Nebraska Supreme Court directly[3] or to the Nebraska Court of Appeals, and then in a petition for further review to the Nebraska Supreme Court if the Court of Appeals rules against the petitioner. *See Akins v. Kenney*, 410 F.3d 451, 454-55 (8th Cir. 2005).

"In order to fairly present a federal claim to the state courts, the petitioner must have referred to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue in a claim before the state courts." *Carney v. Fabian*, 487 F.3d 1094, 1096 (8th Cir. 2007) (internal citation and quotation omitted). Although the language need not be identical, "[p]resenting a claim that is merely similar to the federal habeas claim is not sufficient to satisfy the fairly presented requirement." *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999). In contrast, "[a] claim has been fairly presented when a petitioner has properly raised the 'same factual grounds and legal theories' in the state courts which he is

_____

[3] Where a life sentence has been imposed in a criminal case, the appeal goes directly to the Nebraska Supreme Court. Neb. Rev. Stat. § 24-1106 (West).

attempting to raise in his federal habeas petition." *Wemark v. Iowa*, 322 F.3d 1018, 1021 (8th Cir. 2003) (citation omitted).

Where "no state court remedy is available for the unexhausted claim—that is, if resort to the state courts would be futile—then the exhaustion requirement in § 2254(b) is satisfied, but the failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default.'" *Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005) (quoting *Gray v. Netherland*, 518 U.S. 152, 162 (1996)).

To be precise, a federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Also, a credible showing of actual innocence may allow a prisoner to pursue his constitutional claims on the merits notwithstanding the existence of a procedural bar to relief. *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013). To invoke the actual innocence exception, a petitioner "must show that in light of all the evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Jennings v. United States*, 696 F.3d 759, 764-65 (8th Cir. 2012) (quoting *Schlup v. Delo*, 513 U.S. 298, 327, (1995)). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Id.* (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).

## B. Nebraska Law Relevant to Procedural Default

Under Nebraska law, you don't get two bites of the postconviction apple; that is, "[a]n appellate court will not entertain a successive motion for postconviction relief unless the motion affirmatively shows on its face that the basis relied upon for

relief was not available at the time the movant filed the prior motion." *State v. Ortiz*, 670 N.W.2d 788, 792 (Neb. 2003). Additionally, "[a] motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal." *Hall v. State*, 646 N.W.2d 572, 579 (Neb. 2002). *See also State v. Thorpe*, 858 N.W.2d 880, 887 (Neb. 2015) ("A motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal, no matter how those issues may be phrased or rephrased.")

Moreover, a person seeking postconviction relief must present his or her claim to the district court or the Nebraska appellate courts will not consider the claim on appeal. *State v. Deckard*, 722 N.W.2d 55, 63 (Neb. 2006) (denying postconviction relief in a murder case and stating: "An appellate court will not consider as an assignment of error a question not presented to the district court for disposition through a defendant's motion for postconviction relief.") Similarly, on appeal, the appealing party must both assign the specific error and specifically argue that error in the brief. Otherwise the claim is defaulted under Nebraska law. *State v. Henry*, 875 N.W.2d 374, 407 (Neb. 2016) (stating an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court).

## C. Deferential Standard Under 28 U.S.C. § 2254(d)

When a state court has adjudicated a habeas petitioner's claim on the merits, there is a very limited and extremely deferential standard of review both as to the law and the facts. *See* 28 U.S.C. § 2254(d). Section 2254(d)(1) states that a federal court may grant a writ of habeas corpus if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). As explained by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362 (2000), a state court acts contrary to clearly established federal law if it applies a legal rule that contradicts the Supreme Court's prior holdings or if it reaches a different result from one of that Court's cases despite confronting indistinguishable facts. *Id.* at 405-06.

Further, "it is not enough for [the court] to conclude that, in [its] independent judgment, [it] would have applied federal law differently from the state court; the state court's application must have been objectively unreasonable." *Rousan v. Roper*, 436 F.3d 951, 956 (8th Cir. 2006).

With regard to the deference owed to factual findings of a state court's decision, section 2254(d)(2) states that a federal court may grant a writ of habeas corpus if a state court proceeding "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Additionally, a federal court must presume that a factual determination made by the state court is correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

As the Supreme Court noted, "[i]f this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The deference due state court decisions "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Id.*

However, this high degree of deference only applies where a claim has been adjudicated on the merits by the state court. *See Brown v. Luebbers*, 371 F.3d 458, 460 (8th Cir. 2004) ("[A]s the language of the statute makes clear, there is a condition precedent that must be satisfied before we can apply the deferential AEDPA [Antiterrorism and Effective Death Penalty Act] standard to [the petitioner's] claim. The claim must have been 'adjudicated on the merits' in state court.").

The Eighth Circuit clarified what it means for a claim to be adjudicated on the merits, finding that:

AEDPA's requirement that a petitioner's claim be adjudicated on the merits by a state court is not an entitlement to a well-articulated or even a correct decision by a state court. Accordingly, the postconviction trial court's discussion of counsel's performance—combined with its express determination that the ineffective-assistance claim as a whole lacked merit—plainly suffices as an adjudication on the merits under AEDPA.

*Worthington v. Roper*, 631 F.3d 487, 496-97 (8th Cir. 2011) (internal quotation marks and citations omitted).

The court also determined that a federal court reviewing a habeas claim under AEDPA must "look through" the state court opinions and "apply AEDPA review to the 'last reasoned decision' of the state courts." *Id.* at 497. A district court should do "so regardless of whether the affirmance was reasoned as to some issues or was a summary denial of all claims." *Id.*

## D.  The Especially Deferential *Strickland* Standard

When a petitioner asserts an ineffective assistance of counsel claim, the two-pronged standard of *Strickland v. Washington*, 466 U.S. 668 (1984), must be applied. The standard is very hard for offenders to satisfy.

*Strickland* requires that the petitioner demonstrate both that his counsel's performance was deficient, and that such deficient performance prejudiced the petitioner's defense. *Id.* at 687. The first prong of the *Strickland* test requires that the petitioner demonstrate that his attorney failed to provide reasonably effective assistance. *Id.* at 687-88. In conducting such a review, the courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

The second prong requires the petitioner to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Further, as set forth in *Strickland*, counsel's

"strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" in a later habeas corpus action. *Id.* at 690.

Additionally, the Supreme Court has emphasized that the deference due the state courts applies with special vigor to decisions involving ineffective assistance of counsel claims. *Knowles v. Mirzayance*, 556 U.S. 111 (2009). In *Knowles*, the Justices stressed that under the *Strickland* standard, the state courts have a great deal of "latitude" and "leeway," which presents a "substantially higher threshold" for a federal habeas petitioner to overcome. As stated in *Knowles*:

> The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold. And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Id.* at 123 (internal quotation marks and citations omitted).

*Strickland* applies equally to appellate counsel, and appellate counsel is entitled to the "benefit of the doubt." *Woods v. Etherton*, 136 S. Ct. 1149, 1153 (2016) (a "fairminded jurist" could have concluded that repetition of anonymous tip in state-court cocaine-possession trial did not establish that the uncontested facts it conveyed were submitted for their truth, in violation of the Confrontation Clause, or that petitioner was prejudiced by its admission into evidence, precluding federal habeas relief under AEDPA; petitioner could not establish that petitioner's appellate counsel was ineffective, as appellate counsel was entitled to the "benefit of the doubt").

# IV. DISCUSSION

## A. Claim One

Claim One consists of four subparts alleging ineffective assistance of trial counsel.

### 1. Claim One, Subparts (1), (3), and (4)

In these three claims, Jones asserts that he was denied effective assistance of counsel and a fair trial because trial counsel failed to suppress, object to, and properly impeach the identification testimony of witnesses Alanna Delany, Saraha Richards, Dale Gaver, and Giovanni Barrios (filing no. 10 at CM/ECF pp. 21-34) (Subpart (1)); failed to properly investigate and call numerous witnesses provided to counsel by Jones who were important to Jones' alibi defense (*id.* at CM/ECF pp. 36-41) (Subpart (3)); and generally failed to conduct an adequate pretrial investigation and to gather defense evidence (*id.* at CM/ECF pp. 41-45) (Subpart (4)).

These claims correspond to Jones' postconviction claims that he suffered prejudice because investigation by trial counsel would have called into doubt the identifications of him as the shooter made at trial, that the failure to object to the identifications prevented the court from reviewing Jones' arguments with respect to the photo lineup, and that investigation of these witnesses would have revealed his "actual innocence" and provided him with alibi testimony. (*See* Filing No. 13-9 at CM/ECF pp. 5-20 (corresponds to Claim One, Subpart (1)), pp. 20-25 (corresponds to Claim One, Subpart (3)), pp. 25-29 (corresponds to Claim One, Subpart (4).) The Nebraska Supreme Court considered the claims together in its opinion affirming the state district court's denial of postconviction relief. The court wrote:

> As raised in both his appellate brief and in his postconviction motion, Jones first asserts that his counsel erred in failing to adequately investigate eyewitnesses and in failing to object at trial to those various eyewitnesses' identifications of him as the shooter.

Prior to trial, Jones moved to suppress witness identification testimony, alleging that the identification procedure used by police was unnecessarily suggestive and tainted the identifications. The evidence adduced at the hearing showed that a lineup consisting of six photographs was used. The photographic lineup accidentally included two photographs of Jones: one in photo position No. 5, and one in photo position No. 6. The detective who created this lineup attributed the error to sloppiness on his part.

On direct appeal, we declined to reach Jones' contentions regarding the denial of his motion to suppress the photographic lineup because we concluded that any objection to his identification had been waived by Jones' failure to object to the identification testimony given at trial.

Though not perfectly clear, Jones appears to argue that he suffered prejudice because investigation by counsel would have cast doubt on identifications made at trial, and that the failure to object prevented the court from reviewing Jones' arguments with regard to the photo lineup. Jones also contends that investigation of these witnesses would have revealed his "actual innocence" and provided him with alibi testimony.

We turn first to Jones' contention regarding the motion to suppress the photographic lineup. As noted above, on direct appeal Jones argued that this court should address the issue on plain error review. But we declined to do so, noting that at trial counsel failed to object when the State's witnesses identified Jones as the shooter. In his motion for postconviction relief, Jones alleged this failure was deficient conduct. Jones contends that the prejudice he suffered as a result of counsel's failure to object was this court's inability to address on appeal the photographic lineup.

An identification procedure is constitutionally invalid only when it is so unnecessarily suggestive and conducive to an irreparably mistaken identification that a defendant is denied due process of law. The U.S. Supreme Court provides a two-part test for determining the admissibility of an out-of-court identification: "'[T]he trial court must [first] decide whether the police used an unnecessarily suggestive identification procedure. . . . If they did, the court must next consider whether [that] procedure so tainted the resulting identification as to render it unreliable and thus inadmissible.'"

At trial, only two witnesses were shown the "tainted" photographic lineup, and only one witness identified Jones from that lineup. The second witness did not make any identification from the photographic lineup. The witness who identified Jones testified that she knew Jones prior to the shooting, that she saw a gun tucked in his jeans, and that she saw him shooting a gun towards her house. Given the witness's prior knowledge of Jones, the erroneous photographic lineup did not taint the witness's resulting identification. Because the motion to suppress was properly denied, there is no merit to Jones' allegation.

Jones next asserts that his counsel "fail[ed] to properly investigate and call numerous witnesses important to [Jones'] defense . . . [and failed] to properly investigate several other aspects" of Jones' defense. Jones appears to be arguing that such investigation would have shed doubt on the witnesses' identifications, and further suggests that counsel was ineffective for "fail[ing] to locate alibi witnesses and pursue an actual innocence claim with an alibi defense." Broadly construed, Jones apparently argues that shedding doubt on the witnesses' identification would have contributed to his "actual innocence" claim.

A review of Jones' motion does not reveal any clear identification of the names of the witnesses or the nature of their alibi testimony. We have held that a movant for postconviction relief is required to specifically allege what the testimony would have been if they had been called in order to avoid dismissal without an evidentiary hearing. Jones failed to do this, and thus he is not entitled to relief on these allegations.

We note, however, that in his motion Jones references the identifications and statements of Jacob Colley, Josue Sanchez, Dale Gaver, Giovanni Barrios, and Alanna Delaney. All were present at the shooting and testified at trial.

Jones alleges Colley was overheard when he told someone "Jamie's baby daddy" (who was Butler) shot and killed the victim. At trial, Colley testified that he heard gunshots but was inside the house at the time of the shooting. On cross-examination, Jones' counsel asked Colley about his statement that Butler was the shooter; Colley explained that he said Butler shot the victim because Butler was the only person of that group of four that he knew.

While Colley did not know Jones previously, he was not shown the erroneous photographic lineup. And Jones' counsel cross-examined Colley at trial about his statement identifying Butler. To the extent that Colley is a witness who would have testified to Jones' "actual innocence," counsel was not deficient because she obtained testimony as to Colley's identification of Butler as the shooter. In his motion, Jones also refers to Sanchez and argues that Sanchez told others that Butler had shot the victim. But Sanchez testified at trial that he was inside the house at the time of the shooting, recovering from a beating he received from Butler, Jones, and the two unidentified members of their group. Thus, any statement made by Sanchez that Butler was the shooter would have been inadmissible.

Jones also identifies Gaver in his motion. Gaver testified that he saw Jones, whom he did not know, show a gun to people before the shooting, and that he saw Jones pull out that gun and fire it into the air and at the house. Gaver was not shown the "tainted" lineup. Jones alleges, without support, that Gaver was told that Jones' photo was placed at number five in the revised version of the photographic lineup.

Barrios also picked Jones out of the revised photo lineup and identified him in the court; he did not know Jones before the shooting. Barrios testified that he saw Jones with a gun at the scene, but that he was helping Sanchez into the house at the time of the shooting. Again Jones alleges, without support, that Barrios was told that Jones' photo was placed at number five in the lineup.

Jones argues that Delaney was shown the "tainted" photographic lineup and identified Jones at photo number 5, but not at photo number 6. Jones thus speculates that Delaney must have been told that Jones' photo was at number 5 in the lineup. But Delaney testified that she did not even see Jones at photo number 6 in the lineup because she had known him before [the] shooting and was able to identify him immediately upon seeing his photo at number 5. Delaney testified that she saw Jones at the shooting with a gun in the direction of the porch of her house.

Finally, Jones references "Mesen Brink." Mesen Brink did not testify and Jones does not offer information as to who this person was or what he or she would have testified to, except to suggest, again without

evidence, that officers were allowing people to interact with each other in the hallways during the investigation.

Summarized, Jones adequately pled an allegation of ineffective assistance of counsel with respect to the failure to object to the photographic lineup and identifications at trial. But that allegation is without merit.

With respect to Colley and Sanchez, Jones' allegations that counsel was ineffective for failing to investigate claims that both made statements suggesting that Butler was the shooter was sufficient, but without merit. As for the other witnesses, including the named Gaver, Barrios, Delaney, and "Mesen Brink," any allegations were insufficiently pled.

There is no merit to Jones' assertion that he was entitled to an evidentiary hearing on his postconviction motion claims.

(Filing No. 13-2 at CM/ECF pp. 8-14 (footnotes omitted).)

Jones did not rebut, by clear and convincing evidence, any of the Nebraska Supreme Court's factual findings. He simply repeats the same arguments he raised in his postconviction proceedings. The Nebraska Supreme Court reviewed all the evidence and determined, based on *Strickland*, that trial counsel was not ineffective for failing to object to the photographic lineup and identifications at trial and for failing to investigate claims that Colley and Sanchez made statements suggesting that Butler was the shooter. The court must grant substantial deference to the Nebraska Supreme Court's findings of fact and conclusions of law. In addition, Jones has not established that the Nebraska Supreme Court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U .S.C. § 2254(d)(1), or that the Nebraska Supreme Court reached "a decision that was based on an unreasonable determination of the facts in light of the evidence," 28 U.S.C. § 2254(d)(2).

With respect to Jones' claims that trial counsel failed to investigate the identifications and statements of other witnesses, including Gaver, Barrios, Delaney, and "Mesen Brink," the Nebraska Supreme Court determined that Jones made insufficient allegations in his postconviction motion. Thus, these claims are procedurally defaulted. *See Hunt v. Houston*, 563 F.3d 695, 703 (8th Cir. 2009) ("Federal courts generally will not review claims that a state court has refused to consider because of the petitioner's failure to satisfy a state procedural requirement"); *Sing v. Frakes*, No. 8:15CV134, 2016 WL 3248244, at *5 (D. Neb. June 13, 2016) (same); *Ildefonso v. Gage*, No. 4:13CV3110, 2016 WL 1092468, at *9 (D. Neb. Mar. 21, 2016), *certificate of appealability denied* (Sept. 15, 2016) (the Nebraska Supreme Court's decision to refuse to consider claims that alleged only conclusions of fact or law was based on a firmly established state procedural rule; in Nebraska, if a postconviction motion alleges only conclusions of fact or law, then the court is not required to grant an evidentiary hearing); *State v. Dragon*, 843 N.W.2d 618, 623 (Neb. 2014) ("If a postconviction motion alleges only conclusions of fact or law, or if the records and files in the case affirmatively show that the defendant is entitled to no relief, the court is not required to grant an evidentiary hearing").

## 2. Claim One, Subpart (2)

In Claim One, Subpart (2), Jones argues that trial counsel was ineffective for failing to seek dismissal of all criminal charges. (Filing No. 10 at CM/ECF pp. 34-35.) Jones asserts that "the only effective remedy" for the unnecessarily suggestive identification procedure and tainted identifications was dismissal of the criminal charges. (*Id.* at CM/ECF p. 34.) Jones opines that there was a "reasonable probability" that the trial court would have dismissed the criminal charges had trial counsel sought dismissal because "the reasoning supporting a motion to dismiss [was] stronger than that supporting [a] motion to suppress." (*Id.* at CM/ECF p. 35.)

Respondents argue that this claim is "unexhausted and procedurally defaulted because Jones did not raise [it] to the state courts in either direct appeal or state

postconviction, and he has no presently available means by which it could be brought in state court." (Filing No. 17 at CM/ECF p. 20.) Because Jones was represented at both trial and on direct appeal by the same lawyer, the postconviction proceeding was effectively his first opportunity to bring this ineffective assistance of counsel claim. *See State v. DeJong*, 872 N.W.2d 275, 295 Neb. 305 (2015). Thus, Respondents assertion that the claim is procedurally defaulted because Jones did not raise it on direct appeal is misplaced. In addition, the court has reviewed the record and finds that in fact Jones did raise this issue in his postconviction motion and postconviction appeal. (*See* Filing No. 13-9 at CM/ECF pp. 18-20 (postconviction motion); Filing No. 13-6 at CM/ECF pp. 16-17 (appellate brief).) The Nebraska state courts, however, did not specifically address this claim. Thus, the court reviews this claim de novo. *See Worthington*, 631 F.3d at 495.

Given that the Nebraska state courts rejected Jones' argument raised in the motion to suppress that the erroneous photographic lineup tainted the witnesses' resulting identification, Jones has failed to demonstrate that the trial court would have dismissed the criminal charges based on the same argument. Accordingly, Jones cannot establish *Strickland*'s prejudice prong for trial counsel's failure to seek dismissal of the criminal charges based on the police's identification procedure. Therefore, Claim One, Subpart (2) lacks merit.

## B. Claims Two and Four

In Jones' second claim, he asserts that his right to due process was violated when the prosecution failed to disclose (1) the recording of his police interview and (2) the photographic line up shown to Jenna McBride in violation of *Brady*.[4] (Filing

---

[4] Respondents assert that Claim Two is "unexhausted and defaulted" because "[n]either part of this clam was raised to the state courts in either direct appeal or in postconviction." (Filing No. 17 at CM/ECF p. 23.) Although this claim was not raised on direct appeal, it was raised in the postconviction proceedings. (Filing No. 13-9 at CM/ECF pp. 29-33, 71.)

No. 10 at CM/ECF pp. 63-67.) In Jones' fourth claim, he contends that he was denied due process and the right to a fair trial because (1) Nebraska's second-degree murder statute is facially unconstitutional as it does not provide fair warning sufficient to prevent arbitrary enforcement (*id.* at CM/ECF pp. 73-89) and (2) the substantive change to the elements of second degree murder and sudden quarrel manslaughter is a new rule of constitutional law that should be applied retroactively to Jones (*id.* at CM/ECF pp. 93-95).

These are claims that could have been, but were not, raised on direct appeal and that were found to be procedurally barred under state law. The Nebraska state district court found that Jones' "claims of prosecutorial misconduct and errors relating to the second degree murder charge, including the jury instructions, are procedurally barred, because they could have been bought on direct appeal." ( Filing No. 13-9 at CM/ECF p. 71.) On appeal, the Nebraska Supreme Court rejected as meritless Jones' assertion that the state district court "erred in finding that his claims regarding the second degree murder instruction and accompanying prosecutorial misconduct were procedurally barred." (Filing No. 13-2 at CM/ECF pp. 6-7.) As noted by the Nebraska Supreme Court, "[a] motion for postconviction relief cannot be used as a substitute for an appeal or to secure further review of issues already litigated on direct appeal or which were known to the defendant and counsel at the time of trial and which were capable of being raised, but were not raised." (*Id.* at CM/ECF p. 7 (citing *State v. Whitmore*, 238 Neb. 125, 469 N.W.2d 527 (1991).) Jones' postconviction claims of prosecutorial misconduct and errors relating to the second degree murder charge were thus barred on independent and adequate state procedural grounds. (Filing No. 13-2 at CM/ECF p. 7; *see also* Filing No. 13-9 at CM/ECF p. 71.) *See Shaddy v. Clarke*, 890 F.2d 1016, 1018 (8th Cir. 1989). For federal habeas purposes, these claims are procedurally defaulted unless Jones demonstrates cause and prejudice excusing the default. *See id.*

To the extent that Jones asserts that cause is established by his counsel's failure to raise and preserve these issues on direct appeal, the court disagrees. While ineffective assistance of counsel may constitute "cause" in some circumstances,

"[n]ot just any deficiency in counsel's performance will do." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). Rather, "the assistance must have been so ineffective as to violate the United States Constitution. In other words, ineffective assistance of counsel adequate to establish cause for the procedural default of some other constitutional claim is itself an independent constitutional claim" which must be presented to the state courts. *Id.* (citation omitted); *see also Tokar v. Bowersox*, 198 F.3d 1039, 1051 n.13 (8th Cir. 1999). Jones did not raise in the Nebraska state courts the claim that appellate counsel was ineffective for failing to raise claims of prosecutorial misconduct and errors relating to the second degree murder charge on direct appeal. *See Osborne v. Purkett*, 411 F.3d 911, 919 (8th Cir. 2005) (a claim of ineffective assistance of direct appeal counsel must be raised in a postconviction motion and on postconviction appeal). Moreover, there is no reason to believe Jones is actually (meaning factually) innocent or that some miscarriage of justice took place. The court has carefully examined the record. The evidence was sufficient to convict Jones beyond a reasonable doubt. As such, Claim Two and Claim Four are dismissed.

## C. Claim Three

In Claim Three, Jones argues that he was denied effective assistance of counsel because appellate counsel failed to raise on direct appeal that trial counsel was ineffective (1) for the reasons set forth in Claim One and (2) for failing to raise *Brady* violations. (Filing No. 10 at CM/ECF pp. 69-70.) The Nebraska state district court and the Nebraska Supreme Court rejected this claim, observing that, in Nebraska, when lawyers from the same office represent a defendant both at trial and on direct appeal, the defendant's first opportunity to assert ineffective assistance of trial counsel is in a motion for postconviction relief. (Filing No. 13-2 at CM/ECF pp. 5, 6 (citing *State v. Lee*, 282 Neb. 652, 807 N.W.2d 96 (2011)); Filing No. 13-9 at CM/ECF p. 71 (citing *State v. Fox*, 286 Neb. 956, 840 N.W.2d 479 (2013)).) Because Jones was represented by lawyers from the same office during the trial court proceedings and on direct appeal, Jones could not have asserted claims of ineffective assistance of trial counsel on direct appeal. (Filing No. 13-2 at CM/ECF p. 6; Filing

No. 13-9 at CM/ECF p. 71.) Indeed, "[c]laims of ineffective assistance of counsel raised on direct appeal by the same counsel who represented the defendant at trial are premature and will not be addressed on direct appeal." *State v. Dunster*, 278 Neb. 268, 279, 769 N.W.2d 401, 410-11 (2009). Thus, Jones cannot show that counsel's failure to assign trial counsel's ineffectiveness on direct appeal constituted deficient performance or prejudiced him. Accordingly, the Nebraska state courts' decisions on this point are neither contrary to, nor an unreasonable application of, *Strickland*.

## D. Claim Five

Last, Jones claims that he was denied due process and the right to a fair trial because the trial court committed plain error in giving Jury Instruction No. 8, the step instruction for homicide cases. (Filing No. 10 at CM/ECF pp. 99-101.) Jones did not raise this claim in his postconviction motion to the state district court but raised it on postconviction appeal to the Nebraska Supreme Court. (Filing No. 13-2 at CM/ECF p. 5.) On appeal, the Nebraska Supreme Court stated: "Jones essentially notes that he did not raise this allegation in his motion for postconviction relief, and thus we need not reach it here." (*Id.* at CM/ECF pp. 5-6.) The Nebraska Supreme Court then concluded that there was no merit to the claim because "Jones was convicted of first degree murder," and "[g]iven the nature of the step instruction given to the jury in this case, the jury never reached the definition of unintentional manslaughter" or "the second degree murder instruction" (*Id.* at CM/ECF pp. 5-6, 8.)

It is true that Jones failed to raise this claim in the district court. The failure to do so would, ordinarily, amount to a procedural default which would bar consideration of his claim here, absent cause and prejudice. *See Shaddy*, 890 F.2d at 1018. However, Jones' failure to raise his claim in the district court arguably was excused when the Nebraska Supreme Court rejected the claim as meritless. *See Blankenfeld v. Clarke*, 753 F. Supp. 1498, 1501-02, 1504 (D. Neb. 1990).

To the extent the Nebraska Supreme Court's decision can be construed as rejecting Jones' claim on an independent and adequate state procedural ground, Claim Five is procedurally defaulted, and the court is barred from addressing its merits. *See Shaddy*, 890 F.2d at 1018. To the extent the Nebraska Supreme Court decision can be construed as a decision on the merits, Jones still is not entitled to habeas relief. "A defendant convicted of first degree murder under a step instruction cannot be prejudiced by any error in the instructions on second degree murder or manslaughter because under the step instruction, the jury would not have reached those levels of homicide." *Robinson v. Sabatka-Rine*, No. 8:13CV197, 2016 WL 5254825, at *14 (D. Neb. Sept. 22, 2016) (quoting *State v. Alarcon-Chavez*, 284 Neb. 322, 335, 821 N.W.2d 359, 368 (2012) (finding the defendant was not prejudiced and his substantial rights were not affected by the manslaughter instruction)); *accord Alarcon-Chavez v. Nebraska*, No. 8:17CV345, 2018 WL 4701309, at *12-13 (D. Neb. Oct. 1, 2018), *appeal dismissed*, No. 18-3511, 2019 WL 2273653 (8th Cir. Apr. 2, 2019). The Nebraska Supreme Court's ruling implicitly found no prejudice for any error in the step instruction because Jones was convicted of first degree murder and thus the jury never reached the definition of unintentional manslaughter or the second degree murder instruction. (Filing No. 13-2 at CM/ECF pp. 5-6, 8.) The court finds that the Nebraska Supreme Court's decision is not contrary to, nor did it involve an unreasonable application of, clearly established federal law. The findings of purposefulness and premeditation are supported by the evidence, and the Nebraska Supreme Court's decision likewise cannot be said to be "based on an unreasonable determination of the facts in light of the evidence presented." Therefore, Jones is entitled to no relief on Claim Five.

## V. CERTIFICATE OF APPEALABILITY

A petitioner cannot appeal an adverse ruling on his petition for writ of habeas corpus under § 2254 unless he is granted a certificate of appealability. 28 U.S.C. § 2253(c)(1); 28 U.S.C. § 2253(c)(2); Fed. R. App. P. 22(b)(1). The standards for certificates (1) where the district court reaches the merits or (2) where the district court rules on procedural grounds are set forth in *Slack v. McDaniel*, 529 U.S. 473,

484-85 (2000). The court has applied the appropriate standard and determined that Jones is not entitled to a certificate of appealability.

IT IS THERFORE ORDERED that the Amended Petition for Writ of Habeas Corpus (filing no. 10) is denied and dismissed with prejudice. No certificate of appealability has been or will be issued. Judgment will be issued by separate document.

Dated this 16th day of October 2019.

BY THE COURT:

s/ *Richard G. Kopf*
Senior United States District Judge